M–T PETROLEUM, INC., Appellant,

v.

Shane BURRIS, Appellee.

No. 08–94–00227–CV.

Court of Appeals of Texas,
El Paso.

July 11, 1996.

Robert E. Motsenbocker, Shafer, Davis, McCollum, Ashley, O'Leary & Stoker, Inc., Odessa, for Appellant.

Edward T. Garza, Luis A. Chavez, The Law Offices of Edward T. Garza, Midland, for Appellee.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

## OPINION

LARSEN, Justice.

M–T Petroleum, an oil well operator, appeals from a judgment in favor of Shane Burris in a personal injury action to recover damages for loss of a thumb. Burris, an employee of an oil field equipment service contractor, was injured while repairing a pumping unit on a lease owned by M–T Petroleum. In four points of error, M–T Petroleum contends it owed no duty to Burris, the condition of its premises was not the proximate cause of Burris' injury, and the court erred in admitting certain expert testimony. Finding that there was no duty of the premises owner to the employee of an independent contractor under these facts, we reverse and render.

### FACTS

M–T Petroleum hired Bill Smith's Pumping Service to repair a broken saddle bearing on one of its pumping units.[1] According to the testimony of its owner, Bill Smith's Pumping Service was an independent contractor. Bill Smith's Pumping repaired oil field equipment for M–T Petroleum on a contract basis and then invoiced for the work performed. Bill Smith's Pumping provided its own tools and its own employees. Bill Smith testified that he was responsible for supervising the work of his employees. With regard to the accident which is the basis for this suit, an employee of Bill Smith's Pumping went to the pump location operated by M–T Petroleum, removed the bearing from the unit, and brought it to Bill Smith's shop for repairs. Burris, an employee of Bill Smith's Pumping, was injured while re-installing the repaired bearing on the pumping unit at M–T Petroleum's well site.

Burris had approximately nine years' experience as an oil field worker, and had repaired about 200 saddle bearings on pumping units. To perform this job, Burris was sent to the location in a winch truck and was accompanied by an assistant, called a swamper. Burris had been a swamper in the past, but was the senior man in charge on this job. When they arrived at the location, Burris inspected the work site. The pumping unit had been shut off for repairs and the pump jack was not running. The pumping unit had a guard which was intended to cover the movable drive belts. Its purpose was to keep objects such as loose clothing, long hair, animals, or fingers from getting caught in the belts and yanked into the pulley mechanisms of the equipment when the equipment was in operation. When Burris arrived at the job site, he immediately noticed that the belt guard for the pumping unit was not over the belt, but was on the ground at the location. He also noticed that this unit did not have a braking mechanism.

Burris and the swamper used the winch truck to raise the walking beam and successfully installed the saddle bearing. Burris decided, however, not to use the winch truck to raise the counterweights on the pumping unit while the pumping rods were being re-connected,[2] although it was undisputed that this was the appropriate method for doing so. Instead, Burris ran the counterweights to the twelve o'clock position by flicking on the pump motor. Then, having turned off the motor, Burris attempted to hold the weights in the up position by grabbing the drive belt with his hand to steady the balance while his swamper reconnected the rods. The counterweight, which weighed several thousand pounds, apparently shifted off-center, pulling

---

1. A saddle bearing is the bearing between the stable vertical poles of the unit (the Sampson post) and the horizontal walking beam that allows the walking beam to pivot.

2. When the counterweights are raised, the horse head end tilts toward the ground so the pumping rods can be reattached.

Burris' hand into the pulley apparatus, severing his thumb and injuring his middle finger.

Burris testified that using the winch truck to lift and lock the counterweights in place was one of the safest ways to reconnect the pumping rods. If he had used the winch truck to raise the counterweights, his hands would not have been on the belt. Burris stated that holding the weights in position by placing his hand on the belt was faster than using the winch. If the belt guard had been in place, Burris would not have been able to use the stationary belt to hold the counterweight and would have been forced to use the winch.

Gary Smith, an expert on OSHA rules and regulations and an attorney, testified via video deposition that M–T Petroleum was negligent for failing to properly train and supervise Burris, and for failing to monitor the work site where Burris was injured. Smith also testified that M–T Petroleum was negligent in violating certain OSHA provisions.

The case was submitted to the jury on negligence theories. The jury found that Burris and M–T Petroleum were each 50 percent negligent. The jury awarded damages totaling $125,000. The court entered judgment for Burris for $71,120.50. M–T Petroleum appeals.

### Duty of Premises Owner to Independent Contractor

The theory advanced by Burris at trial was that the absence of the belt guard was a dangerous premise condition, the existence of which breached M–T Petroleum's duty to provide a safe workplace. On appeal, Burris argues that the duty owed him by M–T Petroleum was to exercise ordinary care based on the foreseeability of the risk that he would be injured by the uncovered belt. Burris further contends Occupational Safety and Health Administration (OSHA) regulations impose upon M–T Petroleum the duty to provide him a safe workplace. Burris argues that M–T Petroleum's failure to comply with certain OSHA provisions is negligence in and of itself, or is at least evidence of negligence.

In its first point of error, M–T Petroleum contends that it owed no duty to Burris under the circumstances surrounding Burris' injury. It first asserts that the unguarded belt was not a dangerous condition. M–T Petroleum argues that the guard was designed to protect objects from being drawn into the flywheel while the equipment was running. Therefore, because the equipment had been shut down for repair and was not in operation, the unguarded condition of the non-moving belt was not dangerous. The risk of harm to Burris, it urges, stemmed from his unsafe work method, that is, intentionally holding onto the belt with his hand, not from the condition of the pumping unit which the guard was intended to screen. M–T Petroleum next contends that even were the uncovered, non-moving belt a dangerous condition, it had no duty to warn of the condition because the uncovered belt was not hidden. Finally, M–T Petroleum asserts that Burris' injury did not result from the alleged defective condition of the unguarded belt, but from his own dangerous activity of grabbing the belt to hold the counterweights in place.

■■ The threshold inquiry in a negligence action is whether the defendant owed a duty to the plaintiff. *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). The existence of a duty is a matter of law, determined from the circumstances of the particular occurrence. *Id.* The plaintiff has the burden of producing facts sufficient to support the legal conclusion that the defendant owed a legal duty to the plaintiff. *Abalos v. Oil Development Co. of Texas*, 544 S.W.2d 627, 631 (Tex.1976).

■ A premises owner owes the duty to warn an independent contractor and its employees of hidden dangers that exist when the contractor enters the premises or arise from activity other than that of the contractor. *Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 747 (Tex.1973). A premises owner, in general, has no duty to see that an independent contractor performs work in a safe manner. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985); *Staublein v. Dow Chem. Co.*, 885 S.W.2d 502, 505 (Tex.App.—El Paso 1994, no writ). Where an activity which results in injury is conducted by, and under the control of, the independent contractor and

the danger arises out of the activity of its staff, the duty to protect from hazards belongs to the independent contractor and not the premises owner. *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19 (Tex.1987); *Abalos,* 544 S.W.2d at 631. The premises owner may be liable, however, when it retains the right to control some part of the independent contractor's work, but fails to exercise the retained control with reasonable care. *Quinn,* 726 S.W.2d at 20; *Redinger,* 689 S.W.2d at 418.

■ Burris' injury here arose out of an activity conducted in the course and scope of his employment with Bill Smith's Pumping, not from any hidden danger existing on the premises. *See Richard v. Cornerstone Constructors, Inc.,* 921 S.W.2d 465 (Tex.App.— Houston [1st Dist.], 1996, n.w.h.)(premises owner not liable to employee of independent contractor injured when he fell from scaffold not meeting OSHA standards, where board was chosen, installed, and used by independent crew); *Staublein,* 885 S.W.2d at 505 (injury to employee of food service contractor in fall from milk crate used as step stool to reach food items in freezer did not arise from defective premise condition but from work activity of employee; premises owner owed no duty of care to contractor's employee to prevent injury where premises owner had no control); *Barham v. Turner Constr. Co. of Texas,* 803 S.W.2d 731, 736 (Tex.App.—Dallas 1990, writ denied)(injury to contractor's employee when metal plate fell and struck his head arose out of contractor's work activity of erecting steel columns and was created by manner in which task was performed; condition of steel columns was not dangerous until contractor's employees raised the columns into the air without first securing or removing erection plates); *Corpus v. K–J Oil Co.,* 720 S.W.2d 672, 674 (Tex.App.—Austin 1986, writ ref'd n.r.e.)(highline was not dangerous to those working below until contractor's foreman caused workover rig's boom to come in contact with highline); *Bryant v. Gulf Oil Corp.,* 694 S.W.2d 443, 446 (Tex. App.—Amarillo 1985, writ ref'd n.r.e.)(premise owner had no control over installation or maintenance of highline; line as constructed did not become dangerous to those working below until contractor's employee cause gin pole to come in contact with line). Although the unguarded condition of the belt existed when Burris entered the premises, it was neither hidden nor a danger until Burris chose to place his hand on the belt as he did.[3] Burris was injured while in the process of reinstalling the saddle bearing, the very type of activity expected of an oil field equipment repair service provider. The method that Burris chose to reattach the rod string arose out of work activity that Bill Smith's Pumping was hired to perform and was not under the control of M–T Petroleum. The dangerous condition of the unguarded belt was created by the manner in which Burris performed his work. *See Staublein,* 885 S.W.2d at 505. Accordingly, Burris and Bill Smith's Pumping were in a superior position to prevent the existence of, to inspect for, and to eliminate or warn of this dangerous use. *See id.*

■ Finding that Burris' injury resulted from the method he chose to perform his work, and not from a premises defect, we then turn to the question of whether M–T Petroleum incurred liability by retaining some control over the work of Bill Smith's Pumping and negligently exercising that control. The right of control must be more than a general right to order the work to start or stop, to inspect progress, or to receive reports. *Redinger,* 689 S.W.2d at 418. In this case, there was no evidence that M–T Petroleum exercised any control over the manner in which employees of Bill Smith's Pumping repaired the saddle bearing. To the contrary, the evidence shows that Bill Smith's Pumping was an independent contractor with exclusive control over the work being performed at the time Burris was injured. Absent evidence supporting the conclusion that M–T Petroleum retained control over the work Burris was performing on its premises, we are constrained to hold that M–T Petroleum had no duty to prevent the harm that befell Burris.

---

3. Burris testified that he noticed as soon as he arrived on location that the belt guard was on the ground rather than covering the drive belts.

Burris further testified that he was exposed to no danger from the uncovered belt because the equipment was not in operation.

**818**

We next address the question of whether the OSHA standards urged by Burris created a duty, the breach of which was either negligence per se or some evidence of negligence. The OSHA regulations Burris relies upon here were clearly intended to protect workers from hazards created by the machine while operating, not while inoperable and under repair.[4] It was the independent contractor's responsibility in this case to re-install the saddle bearing; Burris had the means to do so without placing his hand in an unreasonably dangerous place, and he alone ultimately decided to perform his job by placing his hand on the belt as he did. The lack of a guard on the belt, although certainly a potential violation of safety regulations when the machine was once again operable, cannot expand the premises owner's duty to the independent contractor here.

Accordingly, M–T Petroleum's first point of error is sustained. Because of our disposition of Point of Error One, it is unnecessary to review M–T Petroleum's remaining points of error.

## CONCLUSION

The trial court's judgment is reversed and judgment rendered that Burris take nothing against M–T Petroleum.

---

**4.** The regulations relied upon by Burris state: "One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks.... The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle." 29 C.F.R. ch. XVII, § 1910.212(a)(1) and (a)(3)(ii)(1992).