**SAMCO PROPERTIES, INC., and Wal–mart Stores, Inc. d/b/a Sam's Wholesale Club, Appellants,**

v.

**Robyn CHEATHAM, Individually, and as Next Friend of Brooke Cheatham, and Marie Brown, Appellee.**

No. 14–96–1000–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 24, 1998.

4. Tex. Penal Code Ann. § 49.09(b) (Vernon Supp. 1998).

470

J. Preston Wrotenbery, Kevin Dean Jewell, Houston, for appellants.

Dennis G. Herlong, David M. Gunn, Clay Crawford, Houston, for appellee.

Before YATES, AMIDEI and FOWLER, JJ.

## OPINION

AMIDEI, Justice.

This is an appeal from a judgment in favor of Robyn Cheatham, individually, and as next friend of Brooke Cheatham, and Marie Brown. The underlying suit was for the wrongful death of Clint Cheatham, who died from injuries suffered when he fell from a Sam's Wholesale Club sign. Samco Properties, Inc., and Wal–Mart Stores, Inc. d/b/a Sam's Wholesale Club bring seven points of error. We affirm in part and reverse and remand in part.

The decedent, Clint Cheatham, was an apprentice electrician employed by Stuard Electric Company. Cheatham and his supervisor were performing maintenance on a Sam's Wholesale Club sign. The sign was approximately 8 feet tall and sat atop a pole 45 feet high. The top of the sign had 2 holes, each of which was 18 inches by 10 inches in size, allowing access through the sheet metal top into the sign's interior. A Wal–Mart employee, R.L. Walton, testified that these holes were designed to allow installation and servicing of the ballast for the fluorescent lighting. After the electrical contractors looked inside the holes at the top of the sign, one of the contractors advised the store manager there were pigeons inside the sign. The store manager told them to take care of it.

Leaving his safety belt in the truck, Cheatham entered the lift bucket, which lifted him to the top of the sign. He then climbed into the sign through one of the holes in the top. Soon after entering the sign, Cheatham fell through the sheet metal bottom of the sign to the ground. He died at a hospital later that day.

Cheatham's wife, daughter, and mother filed suit against Samco Properties, Inc. and Wal–Mart Stores, Inc. d/b/a Sam's Wholesale Club (collectively "Wal–Mart") asserting products liability and negligence causes of action. The case was tried to a jury. Although the jury found no products liability, the jury did find Wal–Mart negligent and Cheatham contributorily negligent, with fault assessed at 50% each. The jury awarded damages to all plaintiffs.

Wal–Mart challenges the failure to submit a requested jury instruction and the sufficiency of the evidence to support the existence of a duty, proximate cause, the apportionment of negligence, the ad litem fee, and damages for pecuniary loss awarded to all appellees. We turn first to the complaint regarding the jury instruction.

### Jury Instruction

In point of error one, Wal–Mart contends the trial court erred in refusing to submit a proposed instruction regarding the duty owed an independent contractor. Appellants contend the instruction actually submitted did not set out the correct standard. The instruction submitted is as follows:

With respect to Wal–Mart, "negligence" by an owner or occupier of a premise is the failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the occupier knows about or in the exercise of ordinary care should know about. "Ordinary care," when used with respect to an owner or occupier of the premises, means that degree of care which would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.

Wal–Mart argues the trial court should have submitted the following proposed instruction:

1. Clint Cheatham was an independent contractor.

2. In order for Wal–Mart to be negligent, you must find that Wal–Mart breached a duty to Clint Cheatham.

3. Wal–Mart owes a duty to warn an independent contractor on its premises only if there was a hidden danger that existed on Wal–Mart's premises when that independent contractor initially entered on Wal–Mart's premises, or from a danger that arose from the activity of Wal–Mart or its employees.

4. Where the activity is conducted by, and is under the control of, an independent contractor, and where the danger arises out of the activity of the independent contractor or the independent contractor's staff, the responsibility or duty is that of the independent contractor, and not that of the owner of the premises.

5. An owner or occupier does not have a duty to see that an independent contractor performs his work in a safe manner.

The trial court has wide discretion to determine sufficiency of instructions and definitions. *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 255 (Tex.1974). The court must submit instructions which are raised by the pleadings and the evidence. TEX.R. CIV. P. 278. The question on appeal is whether the requested instruction is necessary to enable the jury to render a proper verdict. TEX.R. CIV.

P. 277. The standard of review is abuse of discretion. *Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343, 349 (Tex.App.—Fort Worth 1996, no writ). Any error in the submission or failure to submit instructions is reversible only if the error complained of probably caused rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1).

In support of their argument, Wal–Mart cites *Shell Chemical Company v. Lamb,* 493 S.W.2d 742 (Tex.1973). The *Shell* court discussed two kinds of cases, "hidden danger" cases and "negligent activity" cases. Regarding hidden dangers, *Shell* held that a premises owner owes a duty to warn an independent contractor and its employees of hidden dangers existing when the contractor enters the premises or that arise from activity other than that of the contractor. *Id.* at 746.

Wal–Mart contends a hidden danger is not involved in this case. Instead, Wal–Mart argues this is a negligent activity case and the jury should have received an instruction regarding the standard in such a case. Negligent activity cases are those in which the dangerous condition arose from the performance of the work for which the invitee was employed. *Id.* at 746. Generally, a premises owner has no duty to see that an independent contractor performs work in a safe manner. *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex.1985). Where an activity resulting in injury is conducted by, and under the control of, the independent contractor and the danger arises out of the activity of its staff, the duty to protect from hazards belongs to the independent contractor and not to the premises owner. *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19 (Tex.1987). An invitee's actions in taking a risk about which he knows or has been warned, or that is open and obvious, does not bear on the question of whether a duty exists on the part of the owner of the premises, but is relevant instead to the invitee's own contributory negligence. *See Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 520–21 (Tex.1978).

Despite Wal–Mart's argument regarding hidden dangers and negligent activity, the supreme court has held that an instruction such as the one submitted in this case is proper in a premises liability case. *Keetch v. Kroger Co.,* 845 S.W.2d 262 (Tex.1992). Furthermore, the instruction submitted in this case is identical to the instruction set out in the Texas Pattern Jury Charges regarding premises liability. STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 65.1A. Although the comments to the Texas Pattern Jury Charge (PJC), mention the duty to warn about a latent defect where the plaintiff is an invitee, the PJC instruction does not expressly reference hidden dangers or negligent activity. *See id.* PJC 66.3 & Comment. No case authority requires submission of more specific instructions regarding the premises owner's duty than the general definition provided in the Texas Pattern Jury Charge and approved in *Keetch.*

Absent any authority, we find no error by the trial judge in refusing to submit the instructions proposed by Wal–Mart and we decline Wal–Mart's invitation to expand the instructions required to be given to a jury in a premises liability case.

### Duty

In claiming it was error for the trial court to refuse to submit their proposed instruction, Wal–Mart also contends there is no evidence to support the jury's answer when the proper standard of care is applied.

In reviewing a "no evidence" challenge, we may consider only the evidence and inferences tending to support the finding, and disregard all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989).

To establish liability in a premises liability case, a plaintiff-invitee must prove:

(1) a condition of the premises created an unreasonable risk of harm to the invitee;

(2) the owner knew or reasonably should have known of the condition;

(3) the owner failed to exercise ordinary care to protect the invitee from danger;

(4) the owner's failure was a proximate cause of injury to the invitee.

*State Dept. of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 237 (Tex.1992).

■ Under the general rule, a landowner need only use reasonable care to make the premises safe for the use of business invitees, and this includes warning invitees of hidden dangers that present an unreasonable risk of harm. *Lefmark Mgmt. Co. v. Old,* 946 S.W.2d 52, 53 (Tex.1997). The independent contractor's employee is held to have no duty to inspect the premises for hidden dangers. *Shell,* 493 S.W.2d at 746. Instead, the invitees may anticipate that the owner will discharge his duty to inspect the premises and warn of any dangerous condition that is not open and obvious. *Id.* at 746–47.

Wal–Mart finds analogous the case of *M–T Petroleum, Inc. v. Burris,* 926 S.W.2d 814 (Tex.App.—El Paso 1996, no writ). M–T hired a contractor to repair a broken saddle bearing on one of its pumping units. *Id.* at 815. The pumping unit had been shut off for repairs and the guard, intended to cover the movable drive belts, was not in place. *Id.* When he arrived, the contractor noticed the lack of a belt guard. *Id.* While installing the repaired saddle bearing, the contractor turned off the motor and attempted to hold the counterweights by grabbing the drive belt in his hand. *Id.* The counterweight shifted, pulling the contractor's hand into the pulley, severing his thumb and injuring his middle finger. *Id.* at 815–16. The jury found both the contractor and M–T 50% negligent. M–T appealed, claiming it owed no duty to the contractor under the circumstances. *Id.* at 816.

The court found that the injury arose out of activity conducted in the course and scope of the contractor's employment, not from any hidden danger existing on the premises. *Id.* at 817. The court determined that the dangerous condition was created by the manner in which the contractor performed his work and, therefore, the contractor was in a superior position to prevent the existence of, to inspect for, and to eliminate or warn of this dangerous use. *Id.* The court further found that M–T exercised no control over the manner in which the contractors repaired the saddle bearing. *Id.* Consequently, the court held that M–T had no duty to prevent the harm that befell the contractor. *Id.*

We find this case distinguishable. In *M–T Petroleum,* the danger of the unguarded belt was not hidden and the court found that, because this was a negligent activity, the employer owed no duty to warn of the danger or to make the premises safe. There is evidence in the present case that the danger was hidden. Appellees' expert, Way Johnston, Ph.D., testified that the bottom of the sign was made of sheet metal, consisting of very thin aluminum that was not strong enough to support a man's weight. Although this expert first testified that the composition of the bottom of the sign was apparent upon observation, he later revised that statement. In response to questions from Wal–Mart's counsel, Johnston testified that the composition of the bottom of the sign was not obvious, and that, if a person were looking inside the sign through the holes on top of the sign, the sheet metal floor was not visible because there was a layer of bird droppings approximately 6 inches thick. Although Johnston speculated that Cheatham entered the sign through one of the two holes in the top of the sign and was attempting to climb on the angle iron bracing when he fell, no one could know exactly how the accident occurred because Cheatham was inside the sign at the time he fell. Thus, the jury could infer from the evidence either that Cheatham was climbing on the iron braces and slipped or he stepped onto the sheet metal floor and fell through the bottom of the sign.

Johnston further testified that the sign was unsafe for a worker to enter because the sign's construction would give a worker a false sense of security that the floor would hold his weight. Johnston observed that Wal–Mart could easily have made the bottom of the sign safe by designing a solid flooring of plywood, wood planking, or metal grating. Johnston added that Wal–Mart should have placed a warning on the sign regarding the dangerous flooring.

The manager of the Sam's Club testified that the contractors were hired by the main office in Arkansas, and that his only contact with the contractors was when they checked

in. The manager testified he gave no warning to the contractors. Another expert for appellees testified that HEB Pantry has a sign somewhat similar to the Wal–Mart sign and it has a walk board inside. The expert agreed that the Wal–Mart sign would have been safer with wood on the bottom.

The Wal–Mart employee who had designed and built the sign, R.L. Walton, testified that the holes were not intended for entry into the sign. Walton conceded it would be dangerous to enter the sign, and that even if a contractor used a safety belt, there was no place to tie off a safety belt. Frank Baker, Jr., a witness called by Wal–Mart and who had installed the sign in question, testified that he did not disagree with Dr. Johnston's report finding the sign dangerous and the danger hidden.

Although we agree with Wal–Mart's assertion that Cheatham disregarded his own safety by not wearing a safety belt, the jury considered this when they assessed 50% of the fault against Cheatham. Despite Cheatham's own negligence, the record contains some evidence showing that the thin sheet metal construction of the bottom of the sign was not readily noticeable from the outside of the sign. In *Union Carbide Corp. v. Burton*, 618 S.W.2d 410 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.), a panel of this court observed:

> There is a distinction between those dangers inherent in the work of an independent contractor, such as the danger of falling from a steel beam while engaged in the construction of a roof, and those dangers or defective conditions which an independent contractor might possibly encounter but which arise out of or result from some act or failure to act upon the part of an owner or occupier of premises.

*Id.* at 413.

In the present case, the danger of falling was a danger inherent in Cheatham's job; however, there is some evidence in this case that the flimsy aluminum bottom of the sign was a hidden danger, and a danger that was caused by Wal–Mart, rather than the contractor.[1]

Based on the evidence, Wal–Mart had a duty either to make the sign safe or warn. The evidence is legally sufficient to support the jury's finding of a duty on the part of appellants. Having found no error in the failure to submit the proposed jury instruction and legally sufficient evidence to support the jury's finding of negligence, we overrule point of error one.

### Proximate Cause

■■■ In point of error two, Wal–Mart challenges the legal and factual sufficiency of the evidence to support a finding of proximate cause. Proximate cause consists of two elements: cause-in-fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995). "The test for cause in fact is whether the negligent 'act or omission was a substantial factor in bringing about injury,' without which the harm would not have occurred." *Id.* It is not sufficient if the defendant's negligence "did no more than furnish a condition which made

---

1. Wal–Mart also cites *Barham v. Turner Constr. Co.*, 803 S.W.2d 731 (Tex.App.—Dallas 1990, writ denied). In *Barham*, an employee of the subcontractor was injured while working with a crew, erecting a forty-foot steel column. *Id.* at 734. A steel erection plate, wired to the top of a column, fell and struck the employee. *Id.* at 734. Because the columns arrived at the project site after the subcontractor crew, the allegedly dangerous condition did not exist on the premises at the time the crew entered the premises. *Id.* at 736. The court determined from the evidence that the condition of the columns was not dangerous until the subcontractor's employees raised the columns into the air without checking whether the erection plates were secure. *Id.* Thus, the court held that the general contractor had no duty to ensure that the subcontractor performed its work in a safe manner unless the general contractor retained and exercised a sufficient right of control to subject it to liability. *Id.*

Wal–Mart contends *Barham* is analogous because the record shows Wal–Mart neither retained nor exercised a sufficient right of control over the work on the sign to subject it to liability. Even if Wal–Mart did not exercise any control over the work performed by Cheatham, Wal–Mart may nevertheless be held liable for the dangerous condition that existed at the time Cheatham entered the premises. There is evidence in this case, unlike in *Barham*, that the dangerous condition existed before Cheatham's entry onto the premises. The evidence shows that the sign in question, with its sheet metal bottom and holes in the top, existed before Cheatham arrived.

the injury possible." *Id.* The evidence must show that defendant's negligence was the proximate and not the remote cause of the injury, justifying the conclusion that the injury was a natural and probable result of defendant's negligence. *Id.*

Foreseeability requires that "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Id.* at 478. The danger of injury is foreseeable if the defendant might reasonably have anticipated the general character of the injury. *Id.* "Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Id.*

Appellee's expert, Dr. Johnston, testified that, in his opinion and based on his observation, the sign was defective and unsafe for a person to go inside. Dr. Johnston believed the sign was dangerous because a person entering the top of the sign could not see that the bottom of the sign was made of material incapable of supporting a man's weight. Because Wal–Mart designed and manufactured the sign with holes in the top, large enough for a man to enter the sign, Dr. Johnston concluded that Wal–Mart should have foreseen a person would climb inside the sign. Dr. Johnston added that Wal–Mart placed no warning on the sign and did not attempt to reinforce the bottom of the sign, despite the foreseeability of potential injury. Although Dr. Johnston agreed that the flimsiness of the material on the bottom of the sign was observable from outside the sign and Cheatham could have performed his job without entering the sign, Johnston concluded that Cheatham's actions were reasonable.

Frank Baker, who installed the Wal–Mart sign, conceded he had no disagreement with Dr. Johnston's report. Baker observed that the sign was structurally sound and within community standards, although he had seen other signs with a walk board inside.

The designer of the sign, R.L. Walton, testified Wal–Mart has made its own signs since 1984. Walton testified that the sign was not designed to be entered or walked on. He testified that the holes were designed to allow a worker, while remaining in the lift bucket, to reach inside the sign and replace the ballast. Walton added that, if the sign needed cleaning or bird removal, the sheet metal sides and bottom were easily unscrewed. Walton believed anyone with common sense would realize they should not attempt to walk on the sheet metal bottom of the sign.

This evidence is sufficient to show the condition of the sign was a cause-in-fact of the injury. Wal–Mart nonetheless argues there is no evidence of foreseeability because Cheatham's conduct was the intervening, superseding cause of his injury. The question of foreseeability involves a practical inquiry "whether the injury 'might reasonably have been contemplated' as a result of the defendant's conduct." *Doe,* 907 S.W.2d at 478. Proximate cause "incorporates policy driven decisions such as when subsequent events will be treated as intervening causes." *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 785 (Tex.1995)(J. Cornyn, concurring).

In *Union Pump,* a Texaco employee, Albritton, helped to extinguish a fire at a Texaco chemical plant. *Id.* at 774. The fire originated in a pump manufactured by Union Pump Company. *Id.* After the fire was extinguished, Albritton was injured when she slipped off a wet pipe rack. *Id.* The court held that, even if the pump fire were in some way a "but for" cause of the employee's injuries, the forces generated by the fire had come to rest by the time she fell off the pipe rack. *Id.* at 776. Therefore, the court concluded that the pump fire did no more than create a condition that made the employee's injuries possible. *Id.*

Wal-mart contends its liability should likewise be severed at the point where Cheatham departed from a safe course of action and entered the sign without a safety harness. We disagree. First, the dangerous condition in *Union Pump* had ceased to exist when the injury occurred. *Id.* at 774. In the present case, the dangerous condition of the sign continued to exist at the time Cheatham fell. Because the dangerous condition continued to exist, there is no basis for severing Wal–Mart's liability.

Second, Union Pump could not have foreseen that, after the pump fire was extinguished, a Texaco employee would choose an unsafe pathway to check out another problem, slip on wet pipes, and suffer injury. The supreme court found this cause of injury too remotely connected to the pump to constitute a legal cause of the injury. *Id.* at 776.

In the instant case, there is evidence that Wal–Mart should have foreseen a person would enter the holes on the top of the sign. Because the holes were designed large enough for a man to enter, it was foreseeable that a contractor would enter the sign through these holes. There was also evidence there was nothing at the top of the sign suitable to connect a safety harness. Finally, there is evidence that a person looking inside the sign from the holes on top could not determine the bottom of the sign was too flimsy to hold a person's weight. Indeed, Frank Baker, who testified for Wal–Mart, stated that he instructs his employees not to enter signs such as the one in question.

Although there is evidence Cheatham was at fault for failing to wear a safety belt, there is evidence Wal–Mart should have foreseen the danger to a contractor. We find sufficient evidence to support the jury's finding the dangerous condition of the sign was a proximate cause of Cheatham's death. We overrule point of error two.

### Apportionment of Negligence

■ In point of error three, Wal–Mart challenges the legal and factual sufficiency of the evidence supporting the jury's apportionment of 50% negligence to Wal–Mart. Wal–Mart alternatively claims: (1) Cheatham was the sole proximate cause of his own death, (2) Cheatham was more than 50% responsible, or (3) the jury finding is so overwhelmingly against the great weight and preponderance of the evidence as to be manifestly unjust.

■ Because we have discussed in depth under point of error two the evidence supporting the jury's finding of proximate cause and found the evidence sufficient, we need not repeat that discussion here. There is also evidence that Cheatham, who violated safety regulations by not wearing a safety belt, was at fault. Even if a different percentage allocation could be supported by the evidence, an appellate court may not substitute its judgment for that of the jury. *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 235 (Tex.App.—Houston [14th Dist.] 1996, writ denied)(upholding a jury finding of 50% negligence attributed to plaintiff). Having found sufficient evidence that both Wal–Mart and Cheatham were at fault, we find no basis for interfering with the jury's apportionment of negligence. Accordingly, we overrule point of error three.

### Ad Litem Fee

■ Under point of error four, Wal–Mart challenges the legal and factual sufficiency of the evidence supporting the ad litem fee award of $100,000.00. Alternatively, Wal–Mart claims the fee is grossly excessive. Wal–Mart further contends that, because appellees were unsuccessful on their products liability and gross negligence claims, they should not recover all of their costs.

Appellees initially assert that Wal–Mart has not preserved its complaint about the allocation of costs because Wal–Mart did not raise this complaint in its motion for new trial. Although we agree Wal–Mart did not preserve its complaint regarding allocation, Wal–Mart was not required to raise this complaint in a motion for new trial.

■ A complaint in a motion for new trial is not required except for the following complaints:

(1) A complaint on which evidence must be heard, such as one of jury misconduct or newly discovered evidence or failure to set aside a judgment by default;

(2) A complaint of factual insufficiency of the evidence to support a jury finding;

(3) A complaint that a jury finding is against the overwhelming weight of the evidence;

(4) A complaint of inadequacy or excessiveness of the damages found by the jury; or

(5) Incurable jury argument if not otherwise ruled on by the trial court.

TEX.R. CIV. P. 324(a)-(b). Complaints about the taxing of costs against a party need not be raised in a motion for new trial or other post-judgment motion to preserve a complaint on appeal if the party made the trial court aware of this complaint. *Dover Elevator Co. v. Servellon,* 876 S.W.2d 166, 172 (Tex.App.—Dallas 1993, no writ).

■ Wal–Mart did not complain in the trial court that the parties should share costs because appellees were partially unsuccessful; rather, Wal–Mart complained the parties should share costs because the ad litem benefitted all parties. The trial court did not expressly rule on this objection, but ruled that judgment was entered without changing the allocation of fees. Because Wal–Mart did not raise a complaint about sharing ad litem fees based on lack of success on all claims, we hold Wal–Mart did not preserve this complaint for review. Wal–Mart did preserve its complaints about sufficiency of the evidence and excessiveness of the fee by raising these complaints in the motion for new trial.

■ A guardian ad litem fee is taxed as part of the "costs" of a lawsuit. TEX.R. CIV. P. 173. A trial court shall allow a reasonable fee to a guardian ad litem appointed to represent a child. *Dalworth Trucking Co. v. Bulen,* 924 S.W.2d 728, 738 (Tex.App.—Texarkana 1996, no writ). The amount of the fee is entrusted to the trial court's discretion and the appellate court will not disturb that discretion absent a showing of clear abuse. *Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 794 (Tex.1987). We may consider insufficiency of the evidence in deciding whether there was an abuse of discretion. *Dalworth,* 924 S.W.2d at 738. Even if the evidence is sufficient, we may nevertheless find an abuse of discretion. *Id.* n. 7.

■ In determining the reasonableness of an attorney's fee, the trial court may consider the time and labor involved, the nature and complexities of the case, the amount of money involved, the attorney's responsibilities, whether the attorney lost other employment because of the appointment, the benefits the client received, contingency or certainty of compensation, and whether the employment is casual or for an established or constant client. *Id.* A reviewing court may look at the record and draw on the common knowledge of the court justices and their experience as lawyers and judges in considering the reasonableness of the fee in light of the testimony, the record, and the amount in controversy. *Id.*

The final judgment awards the guardian ad litem $100,000.00 in attorney's fees, plus $10,000.00 in conditional appellate fees. The evidence consisted of the testimony of the ad litem, David Walker, and of another attorney, David Jameson. Walker testified that the case was somewhat complex, and that his activities included reviewing the case file, deposition testimony, records, and reports. Walker also testified he attended mediation, pre-trial hearings, and spoke with representatives of companies regarding structured settlements. Walker performed legal research on the law of trusts and structured settlements. Walker stated he documented time "exceeding 128 hours." Walker did not offer an hourly rate, but testified he believed a reasonable fee was $100,000.00 and that a reasonable fee for future appellate work was a total of $10,000.00. On cross-examination, Walker admitted he attended no depositions and filed no pleadings.

David Jameson testified he had served as guardian ad litem in both state and federal courts and is familiar with the factors a court must consider in determining an appropriate fee for a guardian ad litem. Jameson stated that, in his opinion, $100,000.00 was a fair and reasonable fee and $10,000.00 was a fair and reasonable total for appellate fees.

Wal–Mart contends the fee of $100,000.00 for 128 hours of work constitutes an hourly rate of $790.[2] In *Dalworth Trucking Company v. Bulen,* 924 S.W.2d 728 (Tex.App.—Texarkana 1996, no writ), the court considered whether a fee of $100,000.00 to a guardian ad litem was excessive. *Id.* at 738. The

---

**2.** Our calculations, using a $100,000.00 fee and 128 hours of work, reveal an hourly rate of $781.25.

ad litem testified he attended the ten-day trial and attended depositions, conferences, and mediation. *Id.* He testified the case was complex and that his participation contributed to the child's substantial recovery. *Id.* He briefed novel issues, attended twenty depositions, was involved in setting up a guardianship for the child, and was involved in settlement negotiations. *Id.* He also testified he lost other employment. *Id.* He testified that his normal hourly rate was $150 and that he spent 199 hours on the case. *Id.*

Applying the ad litem's usual hourly rate, the court calculated the fee for serving as guardian ad litem would have been $29,850.00, rather than the $100,000.00 actually awarded, a sum reflecting an hourly rate of $500.00. *Id.* Despite the attorney's testimony, the court found the award of $100,000.00 excessive, supported by insufficient evidence, and an abuse of discretion. *Id.* The court modified the judgment to award an ad litem fee of $40,000.00. *Id.*

We find *Dalworth* analogous and persuasive. In our estimation, a fee that represents an hourly rate of approximately $780 is excessive. Furthermore, Walker's testimony regarding his activities falls far short of the evidence of participation in *Dalworth*. Accordingly, we find the evidence insufficient to support the fee of $100,000.00. We sustain point of error four.[3]

## Pecuniary Losses

⬛ Under points of error five and seven, Wal–Mart challenges the legal and factual sufficiency of the evidence supporting the award for pecuniary loss in the future to Brooke and Robyn Cheatham. Under point of error six, Wal–Mart challenges the legal and factual sufficiency of the evidence supporting the award for pecuniary loss to Marie Chambers.

Wal–Mart also claims the trial court's refusal to allow evidence of pecuniary contributions Brooke and Robyn will receive from Robyn's remarriage renders the jury's awards rank speculation. Wal–Mart has not raised a separate point of error or claim that

the trial court erred in excluding evidence of the financial contributions of Robyn's present husband. Therefore, Wal–Mart appears to contend that, absent any evidence of the support received during the second marriage, any award would be based on speculation. We disagree.

⬛ Damages in a wrongful death action are measured by the pecuniary loss to the beneficiary. *John Deere Co. v. May*, 773 S.W.2d 369, 379 (Tex.App.—Waco 1989, writ denied). Recovery is limited to the present monetary value of the benefits, including money and other benefits that can be valued in money, which the beneficiary could reasonably expect to receive from the deceased had he lived. *Id.* A parent's services to a child, such as nurture, care, education, and guidance, have a monetary value in addition to any financial contributions. *Id.*

The Waco Court of Appeals has observed that measuring a beneficiary's pecuniary loss is inherently speculative and imprecise and is therefore best left to the jury's common sense and sound discretion. *Id.* at 379–80. Fifty years ago, the Texarkana court discussed the difficulties in proving, measuring, and challenging the jury award of pecuniary loss and concluded that "[t]he judgment of the jury is as good as that of the court, and it should prevail unless it appears that the verdict is influenced by passion or prejudice and is not the result of honest convictions." *Louisiana & A. Ry. Co. v. Chapin*, 225 S.W.2d 614, 616 (Tex.Civ.App.—Texarkana 1949, writ ref'd).

Wal–Mart argues that the only testimony regarding Brooke's relationship with her father came from Robyn Cheatham and that this testimony is legally insufficient to support the award for pecuniary damages in the future. Robyn testified:

> He was a great daddy. He took her everywhere with him, and I mean he helped out with her. He changed her diaper, he fed her, he gave her bottles, he gave her baths. He started taking her fishing with him almost as soon as she could sit up.

---

**3.** Unlike the *Dalworth* court we have no testimony regarding Walker's usual hourly rate that

would give us a basis for modifying the judgment.

And they just had a really good relationship. They were buddies.

This is not the only evidence pertinent to the jury's award for pecuniary loss. An economist, Dr. Herbert Lyon, testified and submitted a written report regarding Clint Cheatham's expected future earnings, taking into consideration Clint's age, life expectancy, tax returns, and other factors. Dr. Lyon testified Clint's future earnings, if he had remained an apprentice journeyman, would have been approximately $690,000.00. If, however, Clint had become a master electrician,[4] he would have earned approximately $862,000.00. These projected earnings totals were discounted to present value. Dr. Lyon also mentioned during his testimony that Robyn had remarried. Therefore, Dr. Lyons reduced his totals by eliminating a claim for compensation for lost household services.

The jury awards for future pecuniary losses to the survivors were: Brooke—$350,000.00; Robyn—$125,000.00; and Marie Chambers—$45,000.00. The total of these awards is $520,000.00, an amount well below the lowest projected earnings total Dr. Lyons calculated. The total amount of the awards to the three survivors is therefore supported by sufficient evidence. In its discretion, the jury awarded the largest share to the daughter, who was five years old at the time of her father's death. Because there is sufficient evidence supporting the jury's awards, we find no basis for questioning the jury's allocation among the survivors. We overrule points of error five through seven.

Having found the ad litem fee excessive, we remand this portion of the judgment to the trial court for further proceedings. We affirm the remainder of the judgment of the trial court.

---

4. Dr. Lyon testified that Robyn Cheatham indicated Clint's career goal was to obtain his master's license. At the time of his death, he was attempting to obtain a journeyman's license.