In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana




______________________________




No. 06- 00-00157 -CV


______________________________






BROOKSHIRE BROTHERS, LTD., Appellant




V.




GREG NICHOLS, Appellee





 



On Appeal from the 1st Judicial District Court


Jasper County, Texas


Trial Court No. 21237





 







Before Grant, Ross, and Bass,* JJ.


Opinion by Justice Bass


Justice Bill Bass, Retired, Sitting by Assignment




O P I N I O N




 This is a slip and fall case. Greg Nichols sued Brookshire Brothers alleging that he had slipped on water in the rear
hallway of the Brookshire Brothers store in Kirbyville, injuring his lower back. A jury determined Nichols' damages
totaled $522,600.00, and found Brookshire Brothers eighty-five percent responsible and Nichols fifteen percent responsible
for the accident. The trial court entered judgment against Brookshire Brothers for $489,604.60, including prejudgment
interest. Brookshire Brothers raises three issues contending (1) that there was factually insufficient evidence of the fall
alleged to have caused Nichols' injuries, (2) that the jury's findings apportioning responsibility for the accident are
supported by insufficient evidence, and (3) that there is insufficient evidence to support the jury's finding of $100,000.00
damages for future medical expenses. We affirm the judgment.

 At the time of trial, Greg Nichols was twenty-one years old, married, with three children. Although a high school
graduate, the record shows that his math skills were at a fifth-grade level and that he read at a third-grade level. All of his
employment had been in unskilled jobs. Five or six weeks before the accident, Nichols accepted employment with Irvin
Daniels, who had contracted to clean the floors at the Brookshire Brothers store in Kirbyville. Nichols worked from 10:00
p.m. until 5:30 or 6:00 a.m. the next day cleaning the floors in the public areas of the store. 

 Nichols testified that on March 5, 1998, he fell in the produce section when he tried to push a bucket aside and slipped on
some water. Although he fell backward, his hands caught most of the force of the fall. He stated that he was embarrassed
but unhurt. After the fall, Nichols went into the back area of the store to get a broom. The passageway in the back of the
store was lighted, but was much darker than the store's public areas. Walking down the hallway, he slipped and fell again
on water that had apparently seeped into the passage from under the door of the meat department. He landed on his lower
back and hit his head on the concrete floor.

 Nichols testified that after the fall he felt "fuzzy-headed," as if he had blacked out. He stated that he hurt so much that he
was afraid to try to walk to the front of the store. Instead, he used the telephone at the back of the store to call Tony
Williams, the store manager. Williams, he said, told him to take some Tylenol and try to "tough it out." When Tylenol did
not help, Nichols again called Williams who, according to Nichols, came to the store and drove him home.

 Eleven days after the accident, Nichols gave a tape-recorded interview to the claims examiner for his employer's workers'
compensation carrier. The jury heard an edited version of the interview in which Nichols gave a description of the accident
and his injuries consistent with his testimony at trial. Again, on August 23, 1998, he described the accident: "slipped in
water on concrete in back of Brookshires & hit head, neck, & back." 

 After considerable conservative medical treatment, Nichols underwent surgery during which Dr. Ian Angel placed titanium
"cages" between two of the vertebrae in his lower back. Whether the procedure resulted in a solid fusion appears uncertain. 
Nichols continued to suffer disabling pain at the time of trial.

 Appellant Brookshire Brothers' first two issues challenge the factual sufficiency of the evidence. Its third issue contends
that the evidence is both legally and factually insufficient to support the verdict. This Court set out the applicable standard
of review inGalveston County Fair & Rodeo, Inc. v. Glover, 880 S.W.2d 112, 117 (Tex. App.-Texarkana 1994), writ
denied, 940 S.W.2d 585 (Tex. 1996) (per curiam). 

 When both no evidence and insufficient evidence points are raised, the court of appeals should rule upon the no evidence
point first. Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981). In reviewing a no evidence point, a court
must consider the evidence and inferences in a light tending to support the finding and disregard all contrary evidence and
inferences. Weirich v. Weirich, 833 S.W.2d 942, 945 (Tex. 1992). A no evidence point will only be sustained if there is a
complete absence of, or no more than a scintilla of evidence to support the trial court's finding. Freeman v. Texas
Compensation Ins. Co., 603 S.W. 2d 186, 191 (Tex. 1980).



 In reviewing a factual sufficiency challenge, we consider all the evidence in the record, including any evidence contrary to
the judgment. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). A factual sufficiency point will only be
sustained if the evidence is so weak as to render the finding unjust. See In re King's Estate, 150 Tex. 662, 244 S.W.2d 660,
661 (1951). We may not substitute our judgment for that of the jury merely because we might have reached a different
conclusion. Westech Eng'g v. Clearwater Constructors, Inc., 835 S.W.2d 190, 196 (Tex. App.-Austin 1992, no writ). The
jury is the judge of the credibility and weight of the witnesses and testimony and may choose to believe one witness and
disbelieve others. McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986).



 In its first issue, Appellant complains that, "The only evidence of a second fall was Nichols' own, self-contradictory
testimony, which is factually insufficient to support the verdict." No one but Nichols saw Nichols fall the second time. In
its argument, Appellant points to several contradictions within Nichols' own testimony. In his deposition, he testified that
the store was empty at the time of the accident, but at trial he said he was "not for certain," and that there was someone
named David in the store with him who saw the first fall. When asked why he did not tell David about the second fall,
Nichols said that he did tell David, and that it was David who told him to call the store manager, Williams.

 Nichols told the workers' compensation investigator that he "tried to get in a hurry" while cleaning up. At trial he denied
he was hurrying any more than usual. Nichols testified that he had walked through the area where he fell only three or four
times since he had worked there and that he had never seen water there before. The store manager, Williams, as well as
Nichols' coworker, Bud Cole, testified that the water was there "just about every night."

 Appellant points out that Williams' testimony failed to corroborate Nichols' version of the events following the second fall. 
Nichols had testified that he called Williams twice after he fell. In his deposition, Williams denied that Nichols had called
or that he had taken Nichols home. At trial three weeks later, he could not remember whether he had driven Nichols home. 
He acknowledged, however, that he initially thought that Nichols had fallen in the front part of the store.

 Another Brookshire employee, Denny Arnold, told the jury that he had overheard Nichols tell Williams that he had fallen
in the produce section, but heard nothing about a second fall. Arnold conceded, however, that he just happened to be in the
vicinity and that he left before they concluded their conversation.

 Brookshire Brothers' argument on this point consists solely of pointing out perceived conflicts in the testimony. Nichols
testified himself regarding his second fall and gave a description of the event to the compensation carrier's adjuster and to
several medical care providers that was consistent with his testimony. A contested fact may be established by the testimony
of a single witness, even an interested witness. It is the jury's province to pass on the weight and credibility of the witness'
testimony and to resolve conflicts in the evidence, including inconsistencies within the testimony of any witness. 
McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986). The jury had the opportunity to consider and weigh the
conflicts and inconsistencies in the evidence regarding the second fall, and by its verdict resolved them in favor of Nichols. 
We conclude that the jury's finding was not so against the weight of the evidence as to be manifestly unjust. Appellant's
first issue is overruled.

 In its second issue, Brookshire Brothers complains that the jury's apportionment of comparative responsibility is supported
by factually insufficient evidence. The jury found Brookshire Brothers eighty-five percent responsible for Nichols' injuries
and Nichols fifteen percent responsible.

 Brookshire Brothers argues that the testimonies of Nichols' own witnesses demonstrate that the jury "grossly understated
Nichols' responsibility." Although not so well lighted as the public areas of the store, the hall where Nichols fell was
lighted. While Nichols testified that he had never seen water collected where he fell, his friend and coworker, Bud Cole,
testified that water was there "just about every night." Williams, the former store manager, characterized the problem as
chronic and severe. "The floor was wet each night," he testified. The problem was serious enough that Cole had
complained about it to the store manager.

 Nichols testified that he "tried to get in a hurry" that night, but he also said that he always had to hurry and that he was
following his "normal routine." The surface where Nichols slipped was gray-white concrete. The sealer on the floor was
old and partially worn away, leaving splotches and irregular shapes on the floor. Appellee argues that this could have
created the illusion that the water was just a part of the existing sealer. The jury saw several photographs of the place
where Nichols fell.

 There was conflicting evidence on this issue, but it is the duty of the trier of fact, not the appellate court, to resolve those
conflicts, and the fact finder's determination should be set aside in only the most exceptional circumstances. 
Browning-Ferris, Inc. v. Hobson,967 S.W.2d 543, 546 (Tex. App.-Houston [14th Dist.] 1998, pet. denied). This rule also
applies to the jury's allocation of comparative fault. Samco Props., Inc. v. Cheatham, 977 S.W.2d 469 (Tex. App.-Houston
[14th Dist.] 1998, pet. denied) (rejecting Wal-Mart's argument in a slip and fall case that plaintiff should have been found
by the jury to be more than fifty percent at fault). The finding that Nichols was fifteen percent negligent is not so against
the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Brookshire Brothers'
Appellate Issue No. 2 is overruled.

 Brookshire Brothers, by its third appellate issue, challenges both the legal and factual sufficiency of the evidence to
support the jury's award of $100,000.00 for future medical expenses.

 A recovery for future medical expenses requires a showing that there is areasonable probability that such expenses will be
incurred in the future. Fibreboard Corp. v. PooI, 813 S.W.2d 658, 681 (Tex. App.-Texarkana 1991, writ denied). An
award for future medical expenses may be based on the nature of the injuries, the medical care rendered in the past, and the
conditions of the injured party at the time of trial. Hughett v. Dwyre, 624 S.W.2d 401, 405 (Tex. App.-Amarillo 1981, writ
ref'd n.r.e.). Expert testimony is not required. K Mart Corp. v. Rhyne, 932 S.W.2d 140, 144 (Tex. App.-Texarkana 1996,
no writ). Although a jury may choose to be guided by expert testimony as to future medical expenses, it is not bound by it. 
Missouri Pacific R.R. Co. v. Roberson, 25 S.W.3d 251, 260 (Tex. App.-Beaumont 2000, no pet.). In Fibreboard, we said
that reasonable probability meant more than a fifty percent chance that such medical expenses would be incurred.
Fibreboard, 813 S.W.2d at 681. But we further stated in Fibreboard that "reasonable probability is determined by a
consideration of the substance of the testimony of the expert witness and does not turn on semantics or on the use by the
witness of any particular term or phrase." Id. at 682 (citing Ins. Co. of N. Am. v. Myers, 411 S.W.2d 710 (Tex. 1966)).

 After a year of conservative treatment, Nichols still suffered disabling pain caused, it was determined, by a herniated
intervertebral disc at the L5-S1 level. Dr. Angel removed the disc and performed a fusion at that level. The operation
involved placing a hollow, cylindrical threaded titanium cage at the L5-S1 level and filling the hollow part with Nichols'
ground bone tissue. In this procedure, two spinal bodies fuse as the packed bone grows through the threads. Dr. Angel
thought the operation a success. Although he acknowledged that a second operation could be necessary if the hardware
became loose or infected, he did not consider that a likely possibility. He did consider it likely that Nichols would develop
epidural fibrosis or traumatic arthritis in the injured area. Dr. Angel said that the fusion would produce more stress on
other discs further up Nichols' spine, perhaps requiring additional surgery. Dr. Angel conceded that physical therapy might
help Nichols' condition.

 Dr. Clark Gunderson, also an orthopedic surgeon, examined Nichols fourteen months after surgery and reviewed his
medical records. Nichols complained of pain in his lower back. Dr. Gunderson found spasm in Nichols' lumbar spine,
together with a marked limitation of motion, and an absence of reflex in his left leg. Dr. Gunderson suggested an MRI,
lumbar myelogram, and other tests to determine if Nichols might benefit from surgery. He explained that because of the
operative technique employed, it is difficult to determine if a solid fusion occurred. Dr. Gunderson stated that the presence
of back pain and the absence of leg pain led him to believe that Nichols may not have a solid fusion. Dr. Gunderson then
summarized Nichols' plight, as follows:

 I think that the best thing that this man could do is hope that he has a failed fusion, like I've demonstrated, and that he
could then be fixed and develop a solid fusion. The unfortunate thing would be if nothing could be done for him and then
he stays with a failed fusion and remains in the amount of pain that he's experiencing presently for the remainder of his life.



 Dr. Gunderson also explained that there is a ten percent chance that adjacent discs will wear out after a fusion. Asked if,
considering Nichols' age, he thought "that he [Nichols] probably will have some additional problems like that," Dr.
Gunderson answered, "Yes."

 Dr. Gunderson estimated that "assuming that everything went well" a conservative estimate of Nichols' future medical bills
would be $100,000.00 to $200,000.00, which would include the cost of surgery, pain management, physical therapy, and
follow-up visits to physicians. Surgery, he estimated, would cost $50,000.00. But Dr. Gunderson conceded that he could
not tell whether Nichols was going to have to have future surgery. 

 Dr. Lee Popejoy examined Nichols twice and reviewed his medical records and Dr. Gunderson's deposition. Dr. Popejoy
concluded that Nichols' future was "fraught with . . . difficulties," and that he would have back pain for the rest of his life
which would only get worse with age. He testified that Nichols would require a pain management program. He agreed that
further tests were needed to determine whether future surgery was required. Dr. Popejoy testified that he believed Dr.
Gunderson's estimate of future medical expenses was conservative. He attributed $50,000.00 to $75,000.00 of those
expenses to the cost of surgery. When asked about the probability of future surgery, Dr. Popejoy responded as follows:

 I'm really not at liberty to make a statement on whether he'll need surgery or not. I know he's going to need a lot of -- a lot
of help and care for the remainder of his life and whether surgery will be part of it -- now, according to what Dr.
Gunderson's deposition was that I saw, he made the statement by -- I remember that he felt like that after -- if it did show a
nonfusion, that the probability -- or the probability of additional surgery was apparent. 



 Brookshire Brothers argues that both Dr. Gunderson's and Dr. Popejoy's estimates of $100,000.00 to $200,000.00 in future
medical expenses assumed the necessity of future surgery, a contingency neither doctor would explicitly characterize as
probable. Brookshire Brothers insists that, absent direct medical testimony that future surgery probably will be required,
the evidence is both legally and factually insufficient to support the jury's finding of $100,000.00 in future medical
expenses.

 Recovery for future medical expenses requires a showing that there is a reasonable probability that they will be incurred. 
Fibreboard, 813 S.W.2d at 681. Brookshire Brothers' argument relies heavily on our holding in Fibreboard, wherein we
defined reasonable probability to mean "more likely than not" or "a more than fifty percent chance."

 In Fibreboard, Dr. J. D. Britton was the sole witness to Pool's future medical expenses. Dr. Britton testified that although
he found pleural thickening in Pool's lungs attributable to asbestos exposure, this was not sufficient for a diagnosis of
asbestosis. Dr. Britton based his estimate of $100,000.00 in future medical expenses on a "worst case scenario" that
assumed Pool would develop lung cancer, mesothelioma, and heart disease as a result of his asbestos exposure. But Dr.
Britton further stated that although Pool had a higher than normal risk of asbestos-related cancers, the possibility that Pool
would get cancer was less than fifty percent. Since there was no evidence offered of future medical expenses referable to
the disease he already had, asbestos-related pleural thickening, we held that the jury's award of $100,000.00 for future
medical expenses was supported by insufficient evidence.

 The facts in the instant case differ significantly from those in Fibreboard. As Brookshire Brothers argues, neither Dr.
Gunderson nor Dr. Popejoy would quantify Nichols' need for further surgery. But unlike the facts in Fibreboard, Nichols
actually suffers from a condition which unquestionably will require future treatment even if further surgery is found to be
unnecessary. There is no shortage of evidence that he has disabling pain, that his prognosis is poor, that his future is
fraught with difficulty, and that he will require medical attention for the remainder of his life. Nichols had already incurred
medical expenses in excess of $35,000.00.

 A jury must consider the substance of the witness' testimony in determining reasonable probability. That determination
does not rest on semantics or on the use by the witness of any particular term or phrase, such as "reasonable probability." 
Lenger v. Physician's Gen. Hosp., Inc., 455 S.W.2d 703, 706 (Tex. 1970); Fibreboard, 813 S.W.2d 658. Although both
doctors refused to characterize Nichols' need for future surgery as probable, the substance of their testimonies justified the
inference that future surgery would be required. It was Dr. Gunderson's opinion that when Nichols' life expectancy of more
than fifty years is considered, his fusion at the L5-S1 level will probably cause similar difficulties at other levels of his
spine. Perhaps most telling was Dr. Gunderson's testimony that "the best thing that this man could do is hope that he has a
failed fusion . . . and that he could then be fixed and develop a solid fusion." 

 Dr. Gunderson estimated the cost of Nichols' future medical care at between $100,000.00 and $200,000.00. The cost of
surgery and attendant expenses was estimated at between $50,000.00 and $75,000.00. Dr. Popejoy thought this estimate
"conservative." Brookshire Brothers insists that these estimates assumed the necessity of future surgery. We conclude,
however, that the record supports the jury's award even if it is assumed that Nichols will need no more surgery. The record
shows that even without surgery, Nichols will require further testing, physical therapy, and a pain management program. 
Dr. Gunderson's testimony clearly implies that without surgery Nichols faces a lifetime of pain which will only get worse as
he grows older. If the costs of surgery and related expenses are disregarded ($50,000.00-$75,000.00), the jury's finding
($100,000.00) was well within the range of the testimony ($100,000.00-$200,000.00) estimating Nichols' future medical
expenses.

 Moreover, if there is a relationship between the injury, the past medical treatment, and the future medical treatment, a jury
may find the probable reasonable amount of future medical expenses from evidence of the reasonable amount of past
medical expenses. Williams Distrib. Co. v. Franklin, 884 S.W.2d 503 (Tex. App.-Dallas 1994), aff'd in part & rev'd in part
on other grounds, 898 S.W.2d 816 (Tex. 1995). Nichols had already incurred $35,000.00 in medical expenses at the time
of trial. There is evidence that even without surgery, he will require medical care for the balance of his life. Nichols was
twenty-one years old at the time of trial. Based on his standard future life expectancy of an additional 53.4 years, the jury's
$100,000.00 award equals $1,872.66 per year for future medical care, an amount not manifestly wrong or unjust under the
evidence.

 We conclude that, measured against the appropriate standards of review, the evidence was legally and factually sufficient
to support the jury's award of future medical expenses. The issue is overruled.



 The judgment of the trial court is affirmed.



 Bill Bass

 Justice



Date Submitted: August 30, 2001

Date Decided: December 31, 2001



Do Not Publish



1-002-CV%20In%20re%20Armenta%20FINAL%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-11-002-CV%20In%20re%20Armenta%20FINAL%20mtd_files/header.htm") ef1;
 mso-footer:url("6-11-002-CV%20In%20re%20Armenta%20FINAL%20mtd_files/header.htm") f2;
 mso-first-header:url("6-11-002-CV%20In%20re%20Armenta%20FINAL%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-11-002-CV%20In%20re%20Armenta%20FINAL%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection2
 {page:WordSection2;}
-->











 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No.
06-11-00002-CV

                                                ______________________________

 

 

 

                                                  IN
RE:  CARLOS A. ARMENTA

 

 

                                                                                                  


 

                                                                                                                            


                                                     Original
Mandamus Proceeding

 

                                                                                                  


 

 

 

 

                                          Before
Morriss, C.J., Carter and Moseley, JJ.

                                              Memorandum
Opinion by Justice Carter

                                                                              

                                                                              








                                                     MEMORANDUM 
OPINION

 

            While incarcerated in the Telford
Unit of the Texas Department of Criminal Justice (TDCJ), Carlos A. Armenta was
allegedly assaulted by another prisoner.  Armenta brought suit against the TDCJ and a
guard, Walter Ayers, claiming that the TDCJ and Ayers misused property and
negligently failed to follow procedure, improperly supplied electricity to an
outlet in the alleged assailants cell, and ignored Armentas warnings that the
assailant would attack him. The TDCJ moved to dismiss Armentas claims against
it, arguing that it could not be sued under 42 U.S.C. § 1983.  In his response, Armenta argued that he did
not sued [sic] TDCJ but under Tex. Civ. Prac.
Rem. Code Ann. §101.021(2).  The
trial court granted the TDCJs motion and dismissed it from the suit, leaving
Ayers as the sole defendant.

            In Armenta v. TDCJ-ID, No. 06-10-00039-CV, 2010 WL 1986638 (Tex.
App.Texarkana May 19, 2010, pet. denied) (mem. op.), Armenta appealed the
dismissal.  However, this Court dismissed
his appeal for lack of jurisdiction because the trial courts dismissal order
did not dispose of all named defendants, and therefore, it was not a final,
appealable judgment.  Id. 

            Here, Armenta seeks mandamus relief,
arguing, as he did in his direct appeal, that the trial court:  (1) erred and abused its discretion in
dismissing defendant TDCJ from the suit; and (2) failed to analyze and
correctly apply the law regarding whether Armenta has standing to suit [sic] TDCJ
for negligence and misuse of property pursuant to Tex. Civ. Prac. Rem. Code Ann. § 101.021.(2).

            We deny the petition for writ of
mandamus because Armenta has an available remedy by appeal. 

            Mandamus is an extreme remedy, and
to be entitled to mandamus relief, a petitioner must show that the trial court
clearly abused its discretion and that the relator has no adequate remedy by
appeal.  In re McAllen Med. Ctr., Inc., 275 S.W.3d 458 (Tex. 2008) (orig. proceeding).  Armenta may appeal the dismissal of the TDCJ
when the trial court enters a final judgment disposing of all claims and all parties.  See
Lehmann v. Har-Con Corp., 39 S.W.3d
191, 195 (Tex. 2001); Jack B. Anglin Co.
v. Tipps, 842 S.W.2d 266, 272 (Tex. 1992). 
Armenta does not cite to any authority demonstrating that the available
remedy by appeal is inadequate in this case, and we are aware of none.  Accordingly, we deny the petition for writ of
mandamus. 

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date
Submitted:          January 18, 2011

Date
Decided:             January 19, 2011