Affirmed; En Banc Rehearing Granted; Majority and Dissenting Opinions on
Rehearing of July 17, 2003, are Withdrawn; Majority and Dissenting Opinions on
En Banc Rehearing filed November 24, 2004









 

Affirmed; En Banc Rehearing Granted; Majority and
Dissenting Opinions on Rehearing of July 17, 2003, are Withdrawn; Majority and
Dissenting Opinions on En Banc Rehearing filed November 24, 2004.

 

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-01-00432-CV

____________

 

WALLACE AND DEANNA
DYALL,
Appellants

 

V.

 

SIMPSON PASADENA
PAPER COMPANY,
Appellee

 



 

On Appeal from the 61st
District Court

Harris County, Texas

Trial Court Cause No. 99-09337

 



 

D I S S E N T I N G   O P I N I O N   ON   E
N   B A N C   R E H E A R I N G

                                                  INTRODUCTION

I respectfully dissent.  The majority’s reasoning is flawed in four
ways, all of which lead the majority to the wrong conclusion.








The first two problems relate to the
nature of this appeal, an appeal of a summary judgment.  First, the majority improperly expands the
scope of the motion to include knowledge of a dangerous condition, even though the
motion was based only on control over the work being performed.  Second, the majority applies the wrong
standard of review.  Instead of looking
at the evidence in the light most favorable to Dyall, the non-movant, the
majority views the evidence in the light most unfavorable to Dyall.

The third and fourth problems stem from
the majority’s reliance on legislative history to conclude that the scope of
section 95.003 is so narrow it excludes all safety issues—even when a premises
owner at a plant with dangerous chemicals informs a maintenance worker that he
can proceed safely with his work without any breathing equipment.  This conclusion directly contradicts the
plain wording of the statute and one of the two examples the sponsoring senator
gave to illustrate what situations the section does not cover.

If these problems are avoided, and the
evidence is viewed in the appropriate light, we find the following.  More than a scintilla of evidence shows that
the Simpson employees knew the plant and the chemicals in it and understood
when protective breathing equipment should be worn.  More than a scintilla of evidence shows that
Dyall and Carter did not know the plant well and were uncertain if they needed
protective breathing equipment.  More
than a scintilla of evidence shows that Simpson employees discussed with Dyall
and Carter their need for protective breathing equipment.  And more than a scintilla of evidence shows
that Simpson employees advised Dyall and Carter that they did not need
protective breathing equipment.

For these reasons, the majority errs in
concluding that no fact issue exists on the control prong of section 95.003.

I.        This Is an Appeal of a Summary Judgment,
Which Means that our Review is Subject to Restrictions.

A.      A
Summary Judgment Is Subject to a Particular Scrutiny.  








As noted earlier, this appeal reached our
court by way of a summary judgment.  When
a summary judgment arrives on our doorstep, it is subject to a great deal of
scrutiny.  We scrutinize the facts in the
light most favorable to the non-movant.  See
Nixon v. Mr. Prop. Mgmt., 690 S.W.2d 546, 548–49 (Tex. 1985).  We scrutinize the facts to see if the
non-movant’s claims create at least a scintilla of evidence creating a fact
issue.  Id.  We scrutinize the motion and the grounds
contained in it to ensure that only the grounds contained in the motion are the
basis of the summary judgment.  See
McConnell v. Southside Indep. Sch. Dist., 858 S.W2d 337, 339–41 (Tex.
1993).

B.      Simpson’s
Motion Was Limited to One Ground.

Simpson brought its motion for summary
judgment on only one ground: lack of control. 
Simpson alleged that it exercised no control over Dyall’s and Carter’s
work, pointing out that it never advised Dyall and Carter how to do their
welding.  Simpson carefully chose its
summary judgment evidence, presenting only evidence to show that Simpson did
not tell Dyall and Carter how to weld. 
One excerpt from Simpson’s motion clearly illustrates the company’s
focus in the motion:

Q.      Would it be fair to say the gentleman [at
Simpson] that showed you where the area was didn’t tell you how to do the
repair work?

                                                         *
* * * * 

A.      He didn’t tell us how to do the repair
work.

Q.      That’s why you guys were out there?

A.      Right.

Q.      Because y’all are, I guess, experts in
fixing this type of work?   

A.      Right.

                                               *
* * * * 

Q.      Would it be fair to say that in the entire
time you were at the Simpson plant no Simpson people told you . . . how to fix
that flange?

A.      To my recollection, no.

Nothing in the motion mentioned the second
element of section 95.003: knowledge of a dangerous condition. 

          

 








C.      The
Majority Opinion Improperly Injected the Second Prong, Knowledge of a Dangerous
Condition, into its Review.

1.       The
majority’s statement of facts highlights Simpson’s lack of knowledge and
Dyall’s knowledge that chlorine dioxide was in the pipe.

The majority admits that it addresses
knowledge, stating, “. . . we would ordinarily restrict our analysis solely to
evidence of control . . . .”  Nowhere is
its focus on knowledge more evident than in its factual statement of the
case.  There, the majority goes into
great detail regarding the Simpson employees’ knowledge and Dyall’s and
Carter’s knowledge concerning the pipe’s contents and what Dyall and Carter
should have known concerning the pipe’s contents.  The thrust of this statement of facts is
fourfold: 1) to show that Simpson thought it had cleared the pipe of chlorine
dioxide; 2) to show that chlorine dioxide has an unusual odor and therefore
Dyall and Carter would have known to wear masks if chlorine dioxide were
present; 3) to show that signs near the pipe warned Dyall and Carter that the
pipes contained chlorine dioxide; and 4) to show that Simpson employees did not
tell Dyall and Carter that they should or should not wear protective breathing
equipment. 

Simpson discussed none of these facts in
its summary judgment motion.  Simpson did
not mention them because its sole focus was that it did not control how Dyall
and Carter welded.

2.       The
majority opinion should not have focused on actual knowledge because Simpson’s
motion mentioned only control.

For several reasons, the majority errs
when it injects actual knowledge into its review of the case.  The first reason is this: a movant can obtain
a summary judgment only on the grounds it discusses in its motion for summary
judgment.  Id.  The purpose of the motion is to notify the
non-movant of the issues he must address. 
If a case involves more than one issue, and one of them clearly is not
discussed in the motion, the non-movant need not address that issue and need
not except to the motion as being vague. 
Id. at 342.  Simpson’s
motion clearly did not address the knowledge prong of section 95.003.








The second reason the majority errs
relates to the first.  When a non-movant
knows what issues are involved in the motion for summary judgment, he gathers
the evidence responsive to those issues and presents it to the trial court.  Generally, the non-movant presents evidence
relating only to the issues contained in the motion, and does not present
evidence related to other issues.  The
evidence may contain some overlap of issues but, generally, the focus is on the
issue challenged in the summary judgment motion.  This record generally supports that
theory.  A review of the deposition
excerpts attached to the response to the motion for summary judgment reveals
that the testimony relates primarily to control and not to knowledge.  It would be inappropriate to assume that Dyall
has presented all of his evidence related to knowledge and to hold against him
based on that assumption.  If anything,
we should assume that Dyall has not presented all of his evidence on knowledge.

Third, even though Dyall may have argued
in parts of his response that Simpson knew the pipe was not completely clear,
that does not enlarge the scope of the motion. 
The rule is quite clear.  A
summary judgment may be granted only on the specific issues presented in the
motion.  See Tex. R. Civ. P. 166a; McConnell,
858 S.W.2d at 339.

Fourth, Dyall did not base his claim of
control on Simpson’s knowledge of what was in the pipe.  Quoting from his summary judgment response,
he claims “[Simpson] exercised control over the manner in which the job was
done, safety-wise, by telling Mr. Dyall and Mr. Carter that they did not need
to return to their shop to get a full-face air tank respirator to work on the
leak.”  In addition, Dyall included in
the body of his response excerpts from the depositions of Simpson employees;
these excerpts support a claim that Simpson employees felt it their duty to
ensure that contractors wore the right protective gear for the job they
performed, and that some of the employees advised Dyall and Carter on the
necessity of wearing protective breathing equipment.








Thus, the motion was limited to control,
Dyall presented evidence responding to the specific claim of control—he did not
rely on knowledge to defeat the summary judgment—and even if Dyall did discuss
knowledge in his response to the motion, the motion controls what grounds can
form the basis of the judgment.  

D.      The
Majority Opinion Looks at the Evidence in the Light Most Negative to Dyall.   

The second problem with the majority
opinion is that it does not view the evidence in the appropriate light.  It generally discounts Dyall’s testimony and
views the evidence in the light most negative to Dyall.  Several examples underscore this point.

First of all, the majority refuses to
acknowledge that Dyall and Carter did not know what chemicals they might
encounter at the plant and did not know if they needed protective gear.  The record supports an inference that Dyall
and Carter were relying on the Simpson employees to tell them if they should
wear protective breathing equipment.  The
record does not conclusively show that Dyall and Carter knew that they were to
work on a pipe that had contained chlorine dioxide and might still contain some
residue of that substance.  The majority
reaches the conclusion—without support from the record—that chlorine dioxide
has such a distinct odor anyone would be able to recognize it.  Yet, a Simpson employee acknowledged on the
record that the plant has many strong odors and a person unfamiliar with the
plant might not be able to discern the chlorine dioxide among the other noxious
odors:[1]

Q.      That’s my point.  In the sense that you may know it’s a bad
odor, but unless you’ve worked around it, you can’t specifically identify what
that specific odor was; is that correct?

A.      Absolutely.  I don’t think you would know what it was.

Q.      So, basically, if it’s your first or
second time into that facility, would you say there are a lot of new odors, if
you’ve never been in a paper mill before, that a general person in the general
population would not be familiar with?

A..     Yes.








Next, the majority reviews an encounter
between Dyall and Carter and Elleven, the Simpson employee in charge of giving
Dyall and Carter their work orders.  Upon
finding out that Dyall and Carter did not have their air packs with them,
Elleven responded, “Well that’s all right. 
I don’t think you’ll need them.” 
Rather than viewing this as some evidence of a Simpson employee telling
Dyall and Carter that they could work safely without protective breathing
equipment, the majority calls the statement “ambivalent:”  “This statement is ambivalent on its face and
cannot reasonably be construed as a command or instruction not to use such
equipment.”  It may not have been a
command, but reasonable minds could reach different conclusions on whether this
statement amounted to advice from someone who was more knowledgeable about the
plant’s chemicals.  More importantly, the
statute does not require a command; it merely requires some level of control
that is more than ordering the start and stop of work.  Tex.
Civ. Prac. & Rem. Code § 95.003(1).

Later, the majority again refuses to make
any reasonable inferences in favor of Dyall. 
This occasion concerns Dyall’s claim that Simpson employees exercised
control by telling Dyall he need not be concerned about a second leak that
sprang from the pipe on which Dyall and Carter worked.  

While Dyall and Carter worked on the pipe,
they detected a foul odor and reported it to Simpson operations employees, who
checked the area where Dyall and Carter worked. 
Either before or after the Simpson employees arrived to check on the
odor, Dyall and Carter noticed a new leak other than the one they were
repairing.  Carter explained:

When I talked to
the guy and told him about the leak, I said, you know, “Is it all the same
thing or is it something else?”  He came
over and he looked, he goes, “Oh, it’s all in—it’s the same pipe.”  I said, “Oh Okay.  He said, “But other than that,” he goes, “I
don’t see anything that would cause an odor which, you know, y’all are speaking
of.”








Two reasonable inferences flow from this testimony:
(1) Carter wanted to know if he could safely work around the leak and (2)
Simpson employees led Dyall and Carter to believe that they could continue
working safely without protective breathing equipment.  Dyall and Carter clearly asked the employees
about the odor and leak because they did not know what substance was leaking
from the pipe and wondered if they should continue their work.[2]
 Yet, the majority uses this testimony as
a springboard to conclude that Carter and Simpson should have known they might
encounter chlorine dioxide because of signs at the plant warning of chlorine
dioxide, and that they should have known in any event when to wear protective
breathing devices and what type they should wear.  This was wrong.

Thus, the majority’s review of the statement of facts and its
conclusions based on the statement of facts are flawed because it (1) injects
an issue not contained in the motion for summary judgment and (2) looks at the
evidence in the light most unfavorable to Dyall.  That is error.

 

II.       The Majority Relies on Legislative
History to Undergird its Holding that Dyall Has Not Created a Fact Issue on
Control.  Holding that Dyall Did Create a
Fact Issue Does Not Offend the Plain Language of the Statute or the Legislative
History.

The majority expends five pages explaining
the history of the movement from a broad imposition of liability on landowners
to a narrower one.  It uses this history
to undergird and justify its holding that Dyall has not created a fact issue on
control.  However, concluding that Dyall
did create a fact issue on control does not offend the plain language of the
statute or the legislative history. 
Because the motion was based on control, our review must consider what
that word means and whether it can encompass advising Dyall whether he should
use protective breathing equipment.

 

 








A.      The
Statute’s Definition of Control Does Not Exclude this Case.

The statute defines control broadly.  Although it does not contain a true
definition of “control,” it does give some direction as to what “control”
means.  The direction comes in two parts,
the first part stating what “control” is, the second part stating what it is
not.  First, the statute states what
control is: direction in the “manner in which the work is performed.”  Tex.
Civ. Prac. & Rem. Code § 95.003(1). 
Then it states what control is not: “the right to order the work to
start or stop or to inspect progress or receive reports.”  Id. 
So, if a property owner takes some action to direct how
subcontractors perform their job and the action is more than simply telling
them when to start and stop their work, or inspecting their work or receiving
reports on the work, that action can qualify as some control.  

It appears the Legislature has said that
simple decisions unconnected with how the job is done, such as when workers
will start and stop work each day or on particular days, do not qualify as
control.  However, decisions related to
the job performance, such as advising workers—who do not know if the pipes on
which they work contain toxic or non-toxic matter—whether they should wear
protective breathing devices, do qualify as some control.  At that point the property owner is advising
the worker how the work should be done, not merely ordering the work stopped or
started.  Thus the statute’s definition
of control does not exclude this case.

B.      The
Legislative History of Chapter 95 Does Not Exclude this Case.

Although the legislative history and the
general movement of the law toward narrower liability on property owners is
relevant, it does not bode badly for this case. 
In fact, this case does not offend that trend and does not involve the
type of facts that led to the enactment of Chapter 95.

1.       The
fact issues here are not like the safety issues in the cases the majority
discusses.








Each of the cases the majority
discusses—cases that apparently led to the enactment of Chapter 95—are
substantively different from this case. 
Here, Dyall was an expert in welding, or at least knew how to weld.  However, because he was not an employee of
Simpson, he did not know the plant facilities and certainly did not know what
substances each of the pipes at the plant carried.  If Dyall and Carter knew which substances at
the plant were toxic and which were not, they would not have asked three or
four times whether they needed air packs or whether a substance was safe to
work around, as they did (1) when they arrived at the plant entrance, (2) when
they received  their work orders from
Elleven, (3) when they asked what the foamy substance was that a worker washed
down a drain, and (4) when a foul odor appeared and they noticed a second
leak.  In effect, Dyall had expert
knowledge only about the welding part of the job; the other part of the job,
knowing which chemicals at the plant could injure him, he did not know.  That is different than the cases cited by the
majority.

In Lee Lewis,[3]
the employee of the sub-contractor was fatally injured by a safety decision
his employer made while the company installed windows in a high rise.  Lee Lewis Constr., Inc. v. Harrison,
70 S.W.3d 778, 781-82 (Tex. 2001).  The
safety decision directly related to work the sub-contractor did and in which it
was an expert, high rise window installation. 
It did not involve, as this case does, a type of work or a work place
with which the sub-contractor was unfamiliar. 
See id. at 784-85.

In Koch Refining, the
premises owner had a safety employee observe the work of its
sub-contractor.  Koch Ref. Co. v.
Chapa, 11 S.W.3d 153, 156 (Tex. 1999).  Koch Refining was held not liable because it
merely observed its contractor work.  Id.
at 156-57.  Unlike the facts
here, the safety employee did not advise the subcontractor on any safety
issues.  Id.








In Dow Chemical, an employee of the
independent contractor sued Dow for injuries allegedly caused by a fellow
employee of the independent contractor.  Dow
Chem. Co. v. Bright, 89 S.W.3d 602, 605 (Tex. 2002).  As with Koch Refining, Dow had only
the authority to stop the work, and it did not engage in discussions with the
independent contractor as to how the job should be done.  Id. at 607-09.  

In each of these cases, the premises owner
either (a) did not discuss with the independent contractor how a certain aspect
of the job should be done, or (b) the independent contractor was working in an
area within its realm of expertise.[4]  This case is different.  Dyall and Carter were not very familiar with
this plant and showed by their actions that they did not know which fumes were
toxic and which were not.  Or, at least
on this record, a fact issue exists on this point.  Welding was their expertise—noxious fumes
were not.

In short, Lee Lewis, Koch
Refining, and Dow Chemical illustrate the fact scenario the
Legislators intended Chapter 95 to reach: an expert sub-contractor suing a
landowner for injuries occurring in the sub-contractor’s area of
expertise.  Our appeal involves a
landowner with more expertise than the subcontractor on the very part of the
job for which the landowner is being sued.

Thus, holding that this case falls within
the control exception to section 95.003 will not open the floodgates for
lawsuits.  This case does not present the
fact scenario Chapter 95 was designed to address.

2.       The
sponsoring legislator’s example of a factual scenario not precluded by section
95.003 is similar to this case.








Finding that this case provides some proof
of “control” is not an inconceivable stretch as the majority argues, for the
legislative history contains an example of control startlingly like this one.  In the example, a maintenance contractor
who has a contract to perform work at the plant arrives to weld on a
pipeline.  The property owner informs the
contractor the lines are clear and ready for welding when they are not
clear.  As a result, the contractor’s
employee is injured by chemicals released from the line.  This is how the legislative sponsor described
it:

Example: Likewise, if we have a
maintenance contractor who gets a contract to perform work at the plant, and
the property owner informs the contractor that the lines are clear and ready
for welding, when in fact they are not, due to the property owner’s negligence,
and an employee of the maintenance contractor is injured by the release of
chemicals.  Nothing in this chapter would
change the burden of proof or the damages recoverable. 

H.J. of
TEX., 74th Leg., R.S. 2611-12 (1995).[5],
[6]

From the legislator’s perspective, the
most important fact in the example—that the land owner negligently informed the
welder he could work safely on the line—is a factual thread running through
this case.  If nothing else, Dyall at
least created a fact issue on whether the land owner, Simpson, led Dyall to
believe he could safely work on the line without protective breathing equipment.

The example also contains facts that are
different than the facts in this case; one of the facts is insignificant, one
is significant.  First, in the example,
the workers were told the line was clear, meaning that it was empty.  Here, the workers were not told the line was
clear, but they were led to believe they did not need protective breathing
equipment because the material in the line was not toxic.  That is an insignificance difference.  Second, in the example, the workers were not
advised how to do their job.  Here, the
workers were advised they did not need protective breathing equipment.  That difference is significant.








Thus, the plain language of the statute
and the Legislative history support a conclusion that this is not the type of
case the legislature intended Chapter 95 to preclude.

III.      When we View the Evidence in the Light Most
Favorable to Dyall, a Fact Issue Emerges.

Thus far, then, we know four important
things.  First, the majority used the
wrong standard of review; second, the majority wrongly considered knowledge;
third, this case falls within the statute’s definition of “control;” and
fourth, the legislative history supports the concept that Dyall could recover
if the facts are reviewed in his favor. 
We do not know one important piece of information—what the evidence
reveals when we review it appropriately. When we view the evidence in the light
most favorable to Dyall, a fact issue emerges, as the following points
illustrate.  

A.      Some
Evidence Shows that Simpson Employees Considered Themselves the Experts and In
Charge of Safety for All People Who Worked at the Plant, Including
Subcontractors.

First, Simpson employees considered
themselves experts and in charge of safety for all people working at the
plant.  In his response, Dyall included
deposition testimony of three Simpson employees, each of whom agreed that they
were responsible for safety at the plant and would not allow contractors to
work around chlorine dioxide—at least not without an air pack or an air-line
respirator.

The first of these employees is Bruce
Stiles, a shift supervisor for the bleach plant facility where the leak
sprouted.  He acknowledged that the pipe
may have had some residue of chlorine dioxide in it, but because he could not
detect an odor of chlorine dioxide, he thought Dyall and Carter could work on
it without protective equipment.

                                           Bruce
Stiles’s Deposition

Q.      On April the 19th when you saw the leak in
the ClO2 [chlorine dioxide] injector that we’re talking about, what were you
doing in the pine bleach plant at the time? 
Were you just performing a routine inspection of the facilities?








A.      Right. 
That was my job.  I walked around,
just checking everything.  

Q.      And you see the leak from--I think you
said a good distance away, you could see it was leaking?                       

A.      Yes.   

Q.      Would you describe it as a spray or just
like a flowing leak?  Or how would you
describe it?

A.      It was a spray.  Probably a pinhole but maybe the size of a
pen point or something.  It was spraying
down on the concrete.  It wasn’t a flow.  It does not take much ClO2 [chlorine dioxide]
at the pure form to be able to see it.

*
* * * *

Q.      Well, what was the leak?  What material was leaking?

A.      While we were running, the material that
was leaking was ClO2 [chlorine dioxide].   


                                                                       *
* * * *

Q.        Did you see a green cloud associated with it?

A.        Yes, there was a green cloud in there also, yes.

Q.        What did you do immediately after you saw that?

A.        I called and told the bleach plant operator to shut the
facility down.

                                               *
* * * *

Q.        Was it your decision to get IPP out there or--

A.        It was a joint decision.

Q.        Why did you want them out there?

A.        Because we can’t run the plant and put ClO2 [chlorine
dioxide] in the air.  We can’t do
that.  Or couldn’t do that.

                                                                       * * * * * 

Q.        You
were over there on several occasions, I mean--

A.        Yes.

Q.        --for
long periods of time?

A.        Yes.  I mean, as far as I remember, I stayed there
basically the whole time, other than maybe go to the phone or something.  There wasn’t a phone right there.

Q.        . . .
And at any time during that interval, the period of time that IPP was out
there, did you witness the clear liquid leak? 
Did you see it still leaking?    








A.        Yes.  When they were putting the goop around it,
that’s how--whoever it was told me that, you know, we hadn’t stopped it.  Because you could still see the liquid
leaking from around the patch he was putting on it.  Yes.

Q.        What
does “a clear liquid” mean to you?

                                                           * * * * * 

A.        I couldn’t smell it and I couldn’t see it so it meant it was
safe, to me.  

Q.        Do you think it was water?

A.        Yeah.  It was mostly
water.  I couldn’t say whether it had any
kind of residue.  But yes, I considered
it to be water.    

Q.        When you say “residue,” do you mean pulp?

A.        No.  I mean maybe it
could have ClO2 [chlorine dioxide] residue. 
I don’t know.

                                                           * * * * * 

Q.        If
there was a low-level exposure coming out of a leak to diluted chlorine dioxide
water, would that be something that a shift supervisor would point out to an
independent contractor that was coming.     


A.        Yes.  But if it was where I could actually smell
it, I would not put a person to work in it, no.

Q.        Why is
that?

A.        Kind of
what chlorine dioxide does.  I mean--

Q.        It’s
bad stuff?

A.        It’s
bad stuff.  I don’t know what it does to
you in the long term, but I know what it does to you short term.  It’s my responsibility also for that
area.  If our maintenance people work in
a chlorine leak or something, they would go in with full face equipment.     

Q.        Full
face equipment.  Now, would that be where
you have your own oxygen with you?     

A.        Not an
air pack no.  It has a canister that
filters it out.

Q.        But
that would filter all your air that you were getting when you were around it
that way?

A.        Yes.

Q.        And you
have those there at the facility?

A.        Yes.








(emphasis added)

The second employee was James Bueker, superintendent of the
pine bleaching plant where Dyall was working. 
Like Stiles, he agreed that he would interrupt a person working around
chlorine dioxide and tell them that they needed an air respirator or mask.  He also felt he had more of a duty to warn
subcontractors who were working unsafely than employees because subcontractors
might not be familiar with the plant and its toxins.

James Bueker’s Deposition

Q.        I want
to ask you about another comment that you made. 
I believe you said that if you were walking through the plant and you
saw someone working in or around a chlorine bleach or a ClO2 [chlorine dioxide]
leak without air respirators or masks, you would have told them that they
probably needed to be wearing an air respirator or mask?   

A.         Uh-huh.

Q.        Why
would you tell them that?

A.        I
wouldn’t care for them to get sick.  I
mean, . . . if I walked by and there was a leak there and the person was
working on it without a mask on and it was dripping a bunch of stuff, either he
would need to put on a mask if he’s going to work there, depending on which way
the wind was blowing.   

A
lot of times if there was a small leak, you could put a water hose on top of
the leak and that would keep it from, say, gassing off and you could very
easily work on something.  But if it was
dripping quite largely or profusely, then our job would be to get everybody
back and try and stop the leak.  And if
not, if it was a big leak, then you better put on a full-face or Scott air pack
and you would have to go in there and flange it.

Q.        . .
. [W]ould you consider that one of your duties, as being the bleach plant
supervisor or superintendent, if you saw someone working unsafely, to point
that out to them?   

A.        Yes,
absolutely.

Q.        At
that time would you have considered that you had the right and the duty to say
the same thing to subcontractors that were in there working, if you saw
them working unsafely?  








A.        Probably
more so to contractors, because they might not be familiar with the area.  

                                                           * * * * * 

Q.        What I’m trying to get at is:  Because you had worked in the industry for
many years, you knew immediately what the smell of chlorine dioxide was.  But if someone had come to that facility and
had never worked in a chlorine dioxide plant, would they be able to identify
that specific odor?

A.        . . . Not as being ClO2 [chlorine dioxide], but it’s an
odor that makes you want to leave.  You
don’t need to know what it is.

 

Q.        That’s my point.  In
the sense that you may know it’s a bad odor, but unless you’ve worked around
it, you can’t specifically identify what that specific odor was; is that
correct?

A.        Absolutely.  I don’t
think you would know what it was.

                                                                       * * * * * 

Q.        So basically, if it’s your first or second time into that
facility, would you say there are a lot of new odors, if you’ve never been in a
paper mill before, that a general person in the general population would not be
familiar with?

A.        Yes.

                                                           * * * * * 

Q.        Is there a possibility that in working around a small leak of
chlorine dioxide it could be diluted enough so that you could work maybe
several feet away from it and it not be so strong that you must run
immediately, but you could continue to work if it’s far enough away? 

A.      Yes.

(emphasis added)

The third employee whose testimony was presented in Dyall’s
response to the summary judgment was Paul Licata, the environmental and safety
manager for Simpson.  As with Stiles and
Bueker, he agreed that he would not allow a contractor to work at the plant
without proper safety equipment.

                                                                              








                                                       Paul
Licata’s Deposition

Q.        . . . The chlorine dioxide water solution, is that commonly
referred to as ClO2 water?

A.        Yes.

Q.        Is that a hazardous substance?

A.        Yes.

                                                           * * * * * 

Q.        No?  Tell me why not.

A.        The water solution itself is mostly water.  And the hazard comes from the chlorine
dioxide off-gassing from the water.  So
it would be an inhalation hazard more than a contact hazard.

                                                           * * * * * 

Q.        If someone is going to be exposed to chlorine dioxide, should
they have ventilation in the area?

A.        If they’re going to be exposed to it, they should remove
themselves from the area.

Q.        If there’s no way--to help them from being exposed to it,
should they have ventilation in the area to help remove the danger?

A.        If there’s no way to avoid the exposure, they should have
respiratory protection.

                                                                       * * * * * 

Q.      Who was in charge of safety on April 19th,
1998 when you were not there?

A.      The operations personnel are responsible
for safety.

Q.      And so for the bleach plant facility, who
would that have been?

A.      That would have been the productions shift
supervisor for the bleach plant.

                                                         *
* * * * 

Q.        Would you, as environmental and safety manager for Simpson
Pasadena Paper Company, have allowed a contractor to work without proper safety
equipment if you knew of it?

A.        No.

                                                           * * * * * 








Q.        Mr. Pitts asked you if you were to see independent
contractors who were working without the proper protection equipment, you
wouldn’t have allowed that to happen, is that correct?

A.        Yes.

Q.        If you knew of independent contractors who were working
with leaking ClO2 water without face shields, without goggles and without
respirators, would you have allowed them to continue working?

A.        No.

*
* * * * 

Q.        What was leaking?

A.        Here again, this is difficult for me to understand.  Because if we had that situation, the Simpson
employee would understand that is in--that would be an emergency situation
because that’s going to off-gassing.  And
if it’s not--For health reasons, it would be an environmental excursion
(phonetic) that we would want to know about. 
So they, No. 1, they shouldn’t be allowing that to happen and, No. 2,
should not be sending anybody into that situation.

                                                                       * * * * * 

Q.      At what parts per million is chlorine
dioxide dangerous to human beings?

A.      I’d have to look that up.  It’s in the one part per million or less
range. 

Q.      So actually, if you’re around chlorine
dioxide, or you had to be, you would want a self-contained air pack; is that
right?

A.      If I was going in to repair a leak that
involved chlorine dioxide, I would have to have an air pack, right, or an
air-line respirator.

Q.      And when you said that Simpson Pasadena
Paper Company had the responsibility to discuss general hazards with
contractors, that would include if they were going to be exposed to chlorine
dioxide water, would it not?

A.      That
would be part of the pulp mill discussion, yes. 

(emphasis added)

The majority does not consider any of this testimony or, if
it does, it also looks at contradictory testimony.  That is error.

 








B.      Simpson Employees Actually
Advised Dyall and Carter Several Times Whether They Would Need Protective Breathing
Gear. 

The second important point we see from
viewing the evidence in the light most favorable to Dyall is that in addition
to considering themselves experts in safety, Simpson employees actually advised
Dyall and Carter if they needed protective breathing gear.  At the gate Dyall and Carter had a brief
discussion with a Simpson employee about protective breathing equipment; he
said he did not think they would need any gear but told them to talk with Jerry
Elleven. 

1.       Dyall
and Carter talked with Jerry Elleven about protective breathing gear. 

The second Simpson employee to discuss
protective safety breathing equipment with Dyall and Carter was Jerry
Elleven.  Dyall and Carter were directed
to him immediately upon arriving at the plant. 
Elleven was responsible for telling Dyall and Carter what Simpson needed
them to do and for showing them where they would be working.  Elleven asked if they had full air
packs.  Upon learning that they had left
them at their company’s headquarters, he told them he did not think they would
need them.  Elleven sent them to “the
safety guy” who issued Dyall and Carter throw-down packs they were to use in
case of an emergency.  Elleven watched
them work at least part of the time.  The
record is not clear if Dyall and Carter later spoke with Elleven or someone
else about the second leak that sprouted.

2.       Dyall
and Carter asked an employee washing a “foamy substance” down a drain if it was
safe.     

After receiving the throw-down packs,
Dyall and Carter drove to the leaking flange. 
They noticed an employee washing a “foamy substance” down a drain.  Not knowing what the substance was, they
asked if they needed rubber boots or if the substance was safe for them to walk
in without rubber boots.  The employee
assured them it was safe.

 








3.       Simpson
employees investigated a second leak that sprang while Dyall and Carter worked
on the flange and led them to believe they need not worry about it.

Although the record is a little unclear at
times, it appears that at least one new leak sprang while Dyall and Carter were
working on the leaking flange.  Dyall and
Carter asked Simpson employees if it was safe to work around the leak.  Simpson employees assured them they could
continue working because the substance flowing from the new leaks was the same
as the material leaking from the flange.

In summary, all of this evidence shows the
following.  Simpson employees considered
themselves experts on the toxins at the plant. 
Dyall and Carter were not experts on the toxins at the plant.  Dyall and Carter did not know if they needed
protective breathing gear and, if so, what kind.  Dyall and Carter consulted with Simpson
employees to ascertain if they needed protective breathing gear, and the
Simpson employees advised Dyall and Carter no protective breathing gear was
needed.  This qualifies as some control
and creates a fact issue.

It is error to hold otherwise.  

IV.      Dyall’s Other Common Law Claims Also Survive
Summary Judgment Because Dyall Raised a Fact Issue Regarding Control.  

The final flaw in the majority’s analysis
relates to Dyall’s other common law 
negligence claims. The majority correctly notes that these claims can be
brought only if the plaintiff meets the two requirements of section 95.003 that
the owner (1) control some aspect of the work and (2) know of the dangerous
condition.  However, because Dyall has
created a fact issue on control, his common law negligence claims should not be
dismissed.  As the majority states, just
as with Dyall’s main claim of negligence, these claims also cannot be brought
unless Dyall first shows that the owner exercised some control over the
work.  Because Dyall met that burden,
Dyall should be able to continue his pursuit of these claims.

                                                              

 








                                                   CONCLUSION

For all of these reasons the court errs in holding that Dyall did not
create a fact issue on the issue of control as raised in Simpson’s motion for
summary judgment and because Dyall created an issue on control, the majority
errs in concluding that Dyall may not continue with his other claims for
negligence.  The court should reverse the
judgment and remand the case to the trial court for further proceedings.

 

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

Judgment rendered and Majority and Dissenting Opinions
on En Banc Rehearing filed November 24, 2004.  (Chief Justice
Hedges and Justices Anderson, Edelman, Frost and Guzman join the majority;
Justice Yates and Seymore join this dissent). 


 

 











[1]  Dyall
testified that he had been to the plant on only one or two prior occasions.





[2]  The majority
concludes it would be ludicrous to hold that Simpson exercised control because
Simpson employees told Dyall and Carter it was safe for them to work; it
concludes this would be tantamount to exercising control by not exercising
control.  I beg to differ.  In a paper mill or a chemical plant, deciding
whether work can be done safely is of paramount importance.  Deciding that protective breathing equipment
does not need to be worn is as much of a decision as deciding that protective
breathing equipment needs to be worn. 
Control is exercised in both decisions.





[3]  The majority’s
description of Lee Lewis Construction, Inc. is inaccurate.  The general contractor was not held liable
simply because it had a regulation that companies use lifelines when working in
high places; rather, the general contractor was more actively involved in
directing the sub-contractor’s work.





[4]  For example, a
sub-contractor who regularly installs windows in high-rise buildings should
know the best way to ensure an employee’s safety while installing the
windows.  See Lee Lewis Constr., Inc.,
70 S.W.3d at 785.  An independent
contractor regularly performing maintenance on large commercial elevated signs
knows the safety concerns connected with working in high places.  See Samco Props., Inc. v. Cheatham,
977 S.W.2d 469, 476. Tex. App.—Houston [14th Dist.] 1998, pet.
denied).





[5]  The majority
argues that we must look only to the statute itself to glean the legislature’s
intent.  However, “[e]ven when a statute
is not ambiguous on its face, we can consider other factors to determine the
Legislature’s intent, including . . . the legislative history; the common law
or former statutory provisions, including laws on the same or similar subjects;
[and] the consequences of a particular construction . . . .” Helena Chem.
Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex. 2001).





[6]  This example
underscores a potential problem with the statute as currently written.  Clearly, the sponsor of the bill believed
Chapter 95 would not apply to this fact scenario.  Yet, the plain language of the statute seems
to cover this example because the worker 1) was injured, Tex. Civ. Prac. & Rem. Code §
95.002(1), 2) by a condition or use of an improvement to property, Id. at
95.002(2), 3) on which he was working, Id., and the property owner 4)
did not retain some control over the work, Id. at 95.003(1), and 5) was
not aware of the dangerous condition, Id. at 95.003(2).